[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 13, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13401

_____

D. C. Docket No. 01-02682-CV-VEH-S

SERRA CHEVROLET, INC.,

Plaintiff-Appellee,

versus

GENERAL MOTORS CORP.,

Defendant-Appellant,

EDWARDS CHEVROLET EAST, INC.,
SUSAN SCHEIN CHEVROLET, INC.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(April 13, 2006)**

Before TJOFLAT, PRYOR, Circuit Judges, and GEORGE[*], District Judge.

PRYOR, Circuit Judge:

This appeal by General Motors of an order of sanctions that imposed a fine of $700,000 and struck the affirmative defenses of GM regarding res judicata, collateral estoppel, and other doctrines of issue preclusion presents two issues: (1) whether it was an abuse of discretion to find that GM disobeyed an order to produce documents relating to vehicle allocation and satellite dealerships; and (2) whether the sanctions violated the Due Process Clause of the Fifth Amendment. Although the district court did not abuse its discretion when it found that GM had violated an order to produce information about its satellite dealerships, the district court violated the due process rights of GM by failing to provide any rational basis for the sanctions it imposed. We affirm in part, reverse in part, vacate in part, and remand this matter to the district court.

## I. BACKGROUND

To explain the context of this appeal, we address three matters. We begin with a short discussion of the controversy that led to litigation in state and federal courts between Serra and GM. We then address the state court litigation. Finally,

---

[*] Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

we discuss the federal litigation, including the discovery disputes and orders that led to this appeal.

## A. Facts Leading to Litigation

Serra Chevrolet operates a Chevrolet dealership in Centerpoint, Alabama. Serra alleges that GM encouraged Serra to open a "satellite dealership," a temporary location where Chevrolet vehicles can be sold, because Serra could not effectively provide service in one location to the large geographic area Serra was assigned by GM. On July 18, 1988, GM and Serra executed a satellite agreement that created a new facility in Gardendale, Alabama.

After the satellite dealership opened, Serra surpassed Edwards Chevrolet, another Chevrolet dealer in Birmingham, to become the leading Chevrolet dealer in the Birmingham area. Serra alleges that Leon Edwards, the owner of Edwards Chevrolet, and the National Automobile Dealers Association (NADA) complained to GM executives about Serra's satellite dealership in Gardendale. Serra alleges that because of these complaints, GM began to allocate fewer automobiles to Serra and more automobiles to Edwards Chevrolet in a discriminatory fashion. As a result of the alleged discriminatory allocation, Edwards Chevrolet increased its sales, while Serra lost sales.

## B.  The State Court Litigation

On April 6, 1998, Serra filed a complaint in state court against Leon Edwards, Edwards Chevrolet, NADA, and several representatives of GM.  The complaint alleged that the defendants had violated the Motor Vehicle Franchise Act (MVFA) under Alabama law.  See Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc., 850 So.2d 259, 261 (Ala. 2002).  Serra contended that the defendants conspired to interfere with the relationship between Serra and GM and to restrict unlawfully the allocation of vehicles to Serra.  See id.  On October 18, 1998, GM filed a motion to intervene with both an answer to the complaint and a counterclaim against Serra for a declaratory judgment, see id. at 262, that GM could legally terminate the satellite agreement between GM and Serra.  After the trial court granted the motion to intervene, Serra amended its complaint to add GM as a defendant, and alleged, among other things, misallocation of vehicles in violation of the MVFA.  See id.

GM ultimately prevailed on both the complaint by Serra and the counterclaim.  With regard to the counterclaim, the trial court concluded that GM could lawfully terminate the satellite agreement.  The Supreme Court of Alabama affirmed that decision without opinion.  As for the complaint filed by Serra, although the jury returned a verdict in favor of Serra on its misallocation claim, the

4

Supreme Court of Alabama reversed and held that the claim was barred by the statute of limitations. Id.

### C. The Federal Litigation

On September 12, 2001, GM terminated the satellite agreement with Serra. On October 23, 2001, Serra filed the instant complaint against GM and other defendants and alleged that GM violated the Automobile Dealer Day in Court Act (ADDCA) when it terminated the satellite agreement. Both the initial and a later amended complaint alleged that the termination was in response to the state court litigation and to demands by Serra's competitor, Edwards Chevrolet. Additionally, Serra alleged that GM engaged in a discriminatory course of conduct that favored Edwards Chevrolet and misallocated vehicles from Serra to Edwards Chevrolet. The complaint was originally assigned to Judge Sharon Lovelace Blackburn. GM moved to dismiss the complaint on several grounds including res judicata and collateral estoppel. GM argued that the Alabama courts had ruled that GM had the right to terminate the Satellite Agreement. The district court denied the motion. GM moved to reconsider or, in the alternative, to certify the legal question for interlocutory appeal, but the district court denied the motion without opinion.

On October 17, 2003, the case was reassigned to Judge R. David Proctor. On April 12, 2004, Serra filed a third amended complaint and added a count for

5

wrongful allocation in violation of the MVFA under Alabama law. Serra alleged that GM wrongfully misallocated vehicles in favor of Edwards Chevrolet. GM moved to dismiss this claim based in part on the preclusive effect of the earlier state court judgment. Serra responded that its allocation claim was limited to wrongful allocations made after the state court litigation, or after April 16, 2001, when the judgment was entered in state court. While this motion was pending, on June 28, 2004, the case was reassigned to Judge Virginia E. Hopkins.

On February 16, 2005, the district court denied the motion to dismiss, without prejudice to the right of GM to raise its defenses of issue preclusion in a later motion for summary judgment. After this denial, GM filed an answer to all three complaints. The answer included 31 affirmative defenses, including the following three defenses, relevant to this appeal, which are based on the preclusive effect of the earlier litigation in state court:

> **FIRST DEFENSE**[:] Plaintiff's claims are barred by the doctrines of res judicata/claim preclusion and/or collateral estoppel/issue preclusion. Failure by the court to dismiss the plaintiff's claims violates the United States Constitution in that a valid enforceable state court judgment precludes the plaintiff's claims in this action. Failure to give that judgment preclusive effect violates the Full Faith and Credit Clause of the United States Constitution.
> . . .
> **EIGHTH DEFENSE**[:] Plaintiff's claims in this action are barred, in whole or in part, by the law of the case doctrine.
> . . .

**TENTH DEFENSE**[:] The claims in this action are barred under the doctrines of judicial estoppel and/or inconsistent positions.

### 1. The Discovery Disputes

On January 9, 2004, Serra and GM submitted a report to the district court that proposed scheduling deadlines and a plan regarding the scope and manner of discovery. With respect to the scope of discovery, the parties disagreed sharply. On January 28, 2004, the district court ordered discovery to proceed on the topics proposed by Serra, including "GM's misallocation of vehicles since 2001" and the "course of dealings between Serra and GM." Although the court ordered discovery on those topics, it allowed GM to object to the extent that Serra operated "outside of the bounds of permissible discovery as outlined by the Federal Rules of Civil Procedure and the case law under the ADDCA" and to seek the assistance of the court if disputes arose.

On February 23, 2004, Serra served GM with its first interrogatories and requests for production, which produced two disputes relevant to this appeal. The first dispute involved the following requests for documents regarding Chevrolet satellite dealerships:

> 2. Any and all documents, in hard copy or electronic format, regarding General Motors' Satellite Program, including but not limited to its implementation, when it was first made available to the Chevrolet

7

dealers body, the purpose of the program, the parameters of the program, and the name, address, and telephone number of the GM officials who were responsible for the implementation and overall oversight of the program to date.

3. A complete list of any and all Chevrolet dealers who participated in and/or were awarded satellite facilities under the same or similar terms as the terms of the satellite facility awarded Serra Chevrolet, and the status of each of these satellite facilities (i.e. open, full point or termination, etc.).

4. Any and all studies, surveys, reports, or other documents in hard copy or electronic format, relating or referencing the satellite program as implemented by GM.

The second dispute involved the request for allocation data for all Chevrolet dealers in the Birmingham area from 1998 forward.

On May 17, 2004, GM objected to the discovery requests. As to the requests for production regarding the satellite information, GM objected to the requests as "overly broad, unduly burdensome, unlimited in time and scope, irrelevant, immaterial, and not reasonably calculated to lead to the discovery of relevant or admissible evidence." GM referred Serra to the documents produced in the state court litigation. As to the request regarding the allocation data, GM objected to the request as "overly broad, unduly burdensome, unlimited in time and scope, irrelevant, immaterial, and not reasonably calculated to lead to the discovery of relevant or admissible evidence" and did not produce any responsive documents.

2. The First Motion to Compel Discovery

8

On June 23, 2004, Serra filed its first motion to compel discovery. On August 27, 2004, the district court held a hearing on the motion. As to the requests for production regarding the satellite dealerships, the court ordered GM to produce all documents "[c]reating, evidencing, terminating, implementing, [and] continuing" the satellite program. The court stressed that "[i]f it has to do with the satellite program, and it's a document, then you need to produce it." GM informed the court that to accomplish this task, it would have "to look through, to sort through all seven thousand dealers across the country" or "contact[] the hundred and fifty or so zone managers across the country and ask[] them to do it." The court responded,"I suggest you contact your hundred and fifty zone managers," and "then you produce the documents . . . that relate to the satellite." The court gave GM 60 days to produce the requested documents.

As to the request for production regarding allocation data for all Chevrolet dealers in the Birmingham area from 1998 forward, the court limited the request from 2001 forward, consistent with the January 28, 2004, order. When the court asked why GM had not produced this data, GM explained that under Alabama law the documents were confidential and GM could not legally produce the documents without either the consent of the other dealers or a court order. The court then ordered GM to produce the documents within 60 days. On August 30, 2004, the

9

district court entered a written order granting the motion to compel discovery in accordance with the terms described in the hearing.

Sixty days after the hearing, on October 27, 2004, GM filed a motion to reconsider regarding the allocation data and argued that there was no factual basis for the claim. That same day, GM produced monthly allocation data, which are the monthly determination of the number and type of vehicles each dealer earned ("File A" data). Although GM produced the data, GM asked Serra "not to produce or disclose it to anyone, including the plaintiff, experts/consultants and third parties, until the Court orders that said production and disclosure is appropriate." The district court denied the motion to reconsider on November 14, 2004, without explanation.

Because GM retained File A documents for only 36 months in the normal course of business, it produced the monthly allocation data for all Birmingham dealers from June 1, 2001, forward. Based on a litigation exception to its retention policy, GM had retained the monthly allocation documents for Serra and Edwards Chevrolet from January 1, 2001, forward and produced all those documents.

On October 29, 2004, counsel for Serra responded by letter to counsel for GM regarding the documents produced. Counsel for Serra stated that GM failed to produce weekly allocation data, which are data regarding the weekly process used

10

to determine how the committed volume of vehicles are delivered and received by the dealership ("File B" data). Counsel for Serra requested the information immediately.

On October 29, 2004, GM produced a list of 23 dealerships across the country that had active satellite agreements. This list was compiled through a search of a computer database that stored information relative to all Chevrolet dealers nationwide. After Serra advised GM that the production did not include terminated satellite agreements, on November 11, 2004, GM supplemented its response with an additional list of 12 dealerships that had terminated satellite agreements.

### 3. First and Second Motions for Sanctions

On November 15, 2004, Serra filed its first motion for sanctions. Serra argued that the responses provided by GM were deficient regarding both the allocation data and the satellite agreements. Serra asked for monetary sanctions, attorneys fees, or, in the alternative, a default judgment. On December 2, 2004, Serra withdrew its motion for sanctions because the parties were attempting to resolve the dispute.

On January 27, 2005, Serra renewed its motion for sanctions. Serra again argued that GM provided incomplete allocation data and information about the

11

satellite dealerships. On February 3, 2005, the district court held a hearing by telephone on the renewed motion for sanctions. The court first addressed the motion regarding the allocation data. Because of upcoming depositions, the court deemed this issue premature and denied the motion in that regard. The court next addressed the satellite dealership information.

The court disagreed with the argument of GM that the August 27, 2004, order required GM to produce only a list of satellite dealers. The court reiterated that it had ordered GM to produce any document that "has to do with the satellite program" and found that GM violated its order in that regard. Then, the court again ordered GM to produce all documents relating to satellite dealerships within 14 days. The court further stated that "starting on the 15th day, if [GM is] not in full compliance with my order, I am going to fine your client $50,000 a day. If you are not [in] full compliance after 14 days, I am going to start sanctioning as to your decision in the case." The court did not provide a rationale as to either potential sanction.

On February 7, 2005, the district court entered a written order, consistent with the rulings stated during the telephone hearing. The court granted in part and denied in part the motion for sanctions. The district court denied as premature the motion for sanctions regarding the allocation data. As for the information about

12

the satellite agreements, the district court found "that GM violated this Court's Order compelling production, entered August 28, 2004 [sic], by failing to provide documents in its possession and control relating to specific satellite dealerships." The district court directed GM "to purge its noncompliance by providing, by the end of business on Thursday, February 17, 2005, all documents responsive to [Serra]'s requests." The district court warned that "failure to comply fully with its production obligations and this Court's orders will result in the imposition of sanctions against General Motors in the amount of $50,000 for every day that GM remains out of compliance. If GM remains out of compliance thereafter, the Court will begin striking GM's defenses." As in the telephone conference, the district court did not provide any rationale for the threatened sanctions.

On February 17, 2005, GM filed a notice of compliance with the district court. GM represented that it had produced a copy of the current form of agreement between GM and GM dealers with respect to approved satellite locations and a current and expired version of a manual that outlined the process for approval of satellite locations. GM also informed the district court that it had performed two searches of its satellite dealership agreements: first, GM had searched the dealer contract files of the dealerships that it had identified in the previous computer search and produced the satellite agreements and

correspondence related to these 35 locations; and second, GM had asked field personnel across the nation to identify current and former Chevrolet satellite dealerships and to locate any documents maintained by the regional offices regarding those locations. These searches produced three satellite dealerships that had not been identified in the earlier computer search. GM produced the names of these dealerships, along with all supporting documentation.

After this production, Serra continued to allege that GM had not disclosed information about all satellite dealerships because depositions and other testimony of GM officials referred to several satellite dealerships that GM had not identified. Throughout February and the beginning of March, Serra advised GM through written correspondence that GM had failed to produce information about all the satellite dealerships. In that correspondence, Serra gave examples of testimonies of several employees of GM who had testified about satellite dealerships that had not been disclosed.

### 4. Third Motion for Sanctions and Order to Show Cause

On April 1, 2005, Serra filed a third motion for sanctions that alleged GM failed to produce either complete satellite dealership information or allocation data for all Birmingham-area Chevrolet dealerships. On May 9, 2005, the court issued

14

an order to show cause that directed GM to explain why it should not be sanctioned for failure to comply with the orders entered August 30, 2004, and February 7, 2005, regarding satellite information and allocation data. The order set a hearing for May 16, 2005, and instructed GM to present testimony from any witness with personal knowledge regarding the satellite program.

In response to the order to show cause, on May 12 and 13, 2005, GM conducted a manual review of the documents in the 4100 contract files of Chevrolet dealers. GM hired 14 paralegals to search the documents contained in each file manually to ascertain whether the dealer had a satellite dealership that had been missed in the two earlier searches. The search yielded nine additional satellite dealerships, and GM produced those documents to Serra.

On May 16, 2005, the district court held a hearing on the order to show cause. After some discussion between the court and counsel for both parties, William Middlekauff, General Director of the Dealer Contractual Group of GM, testified. Among other things, Middlekauff testified regarding the satellite information and the searches performed by GM to obtain and produce the information to Serra.

On May 20, 2005, the district court entered an order that found GM in contempt, fined GM $700,000, and struck the affirmative defenses regarding the

preclusive effect of the state judgment. The court addressed two issues in the sanction order. After briefly reciting the history of the discovery disputes and court action, the court first addressed the satellite information. The court recounted that this information was ordered to be produced by October 27, 2004, and that, on February 3, 2005, the court "verbally held GM in contempt" for not producing these documents and ordered GM to purge itself of the contempt by February 17, 2005. The court focused on the testimony of Middlekauff and found the following: (1) Middlekauff did not dispute that GM had not searched for this information until early November 2004; (2) on February 11, 2005, Middlekauff sent an e-mail to regional managers requesting satellite information, and he learned that three satellite dealership had not been disclosed; (3) before this e-mail, the search had been limited to a computer search; (4) GM did not perform a manual search of its files until May 12 and 13, 2005, and this search identified nine additional satellite dealerships; and (5) the dealership file produced to Serra on the Vaden, Georgia, location lacked documents that should be in every satellite file.

Second, the court addressed the allocation data. The court found that the failure of GM to retain File B, or weekly allocation, data before November 7, 2001, the date on which GM first began retaining such data, was not discovery abuse. As to the File A, or monthly allocation, data, the court stated that the discovery order

16

dated January 28, 2004, which listed as an area of discovery "GM's allocation of vehicles since 2001," required GM to produce vehicle allocation data from all Birmingham dealers, and not only Edwards Chevrolet, as argued by GM. GM retained and produced all File A data for Serra and Edwards Chevrolet, but because of its policy on document retention, GM retained and produced the File A data for the other Birmingham dealers from June 2001 forward. The court found that "any destruction of File A data for the period earlier than 36 months prior to [the January 28, 2004] Order was a violation of such Order." The court concluded "that GM has made a practice throughout this action of unreasonably narrow interpretations of discovery requests and court Orders."

The district court found that "GM has engaged in a pattern of disregarding discovery obligations, not responding to discovery requests until ordered to do so, and even then totally disregarding this court's deadlines for complying with its Orders." The court highlighted the fact that "GM knew that it had not performed a manual search of its [dealer] files," but "chose to rely on its computer search until six (6) days before the end of the period allowed GM to purge itself of contempt, before sending an e-mail to regional managers." The court also stated that "[e]ven after the responses to the e-mail established that the computer search was incomplete, GM delayed approximately one (1) month before it undertook the

17

manual search." Finally, the court reasoned that "Middlekauff's testimony that the Vaden, Georgia dealership file lacked documents that 'would be' in 'every' satellite dealership file, calls into question the completeness of GM's production even at this late date."

The court concluded that GM did not purge itself of contempt until May 16, 2005, the date on which the latest satellite information was produced. The court calculated that, under the original contempt order, GM was subject to sanctions of $4,900,000 for the 98 days of contempt. Without explanation, the court then limited the monetary sanctions to $700,000, the equivalent of fourteen days of contempt. Additionally, the court stated that "in lieu of monetary sanctions, it is more appropriate to impose non-monetary sanctions." Again, without explanation, the court struck the affirmative defenses of res judicata, collateral estoppel, and other related doctrines of issue preclusion. The order also stated that "GM will not be permitted to challenge any aspect of Serra's expert's report . . . to the extent that such challenge is based . . . on such expert's lack of information regarding satellite dealerships."

GM filed an interlocutory appeal that challenged the sanctions imposed by the district court. GM moved to stay the proceedings while it appealed to this Court, but the district court denied the motion and stated that "[t]he Sanctions

Order is, unfortunately, mundane in a world where discovery abuse has become common, and refusal to comply with discovery requests, or even discovery Orders, often appears to be a tactical decision made after a cost/benefit analysis by the litigants." The district court concluded that "[t]he sanctions imposed were neither harsh nor an abuse of discretion under the circumstances. In other words, this is a garden variety discovery abuse case, and granting the Motion to Stay would place an imprimatur of importance that the issues, and facts, do not warrant."

On June 28, 2005, GM deposited $700,000 with the clerk of the district court, and the litigation continued.

## II. STANDARD OF REVIEW

"[T]he standard of review for an appellate court in considering an appeal of sanctions under [R]ule 37 is sharply limited to a search for an abuse of discretion and a determination that the findings of the trial court are fully supported by the record." BankAtlantic v. Blythe Eastman Pain Webber, 12 F.3d 1045, 1048 (11th Cir. 1994) (quoting Pesaplastic C.A. v. Cincinnati Milacron Co., 799 F.2d 1510, 1519 (11th Cir. 1986)). "A district court abuses its discretion when it misconstrues its proper role, ignores or misunderstands the relevant evidence, and bases its decision upon considerations having little factual support." Arlook v. S. Lichtenberg & Co., 952 F.2d 367, 374 (11th Cir. 1992). We review de novo the

19

argument that the sanctions imposed by the district court violated due process. BankAtlantic, 12 F.3d at 1050 (11th Cir. 1994).

## III. DISCUSSION

"It is beyond peradventure that all federal courts have the power, by statute, by rule, and by common law, to impose sanctions against recalcitrant lawyers and parties litigant." Carlucci v. Piper Aircraft Corp., 775 F.2d 1440, 1446 (11th Cir. 1985). Under Federal Rule of Civil Procedure 37, "[i]f a party . . . fails to obey an order to provide or permit discovery . . . , the court in which the action is pending may make such orders in regard to the failure as are just." Fed. R. Civ. P. 37(b)(2). Notwithstanding the clear authority of a federal court to enforce its orders, this appeal presents serious issues about whether the discovery orders of the district court were violated and, if so, whether the sanctions against GM were just.

Our discussion is divided into two parts. We first address whether the district court abused its discretion when it found that GM had disobeyed orders to produce documents relating to vehicle allocation and satellite dealerships. Because the district court did not abuse its discretion in finding that GM violated an order to produce information about satellite dealerships, we then address whether the sanctions entered against GM violated the Due Process Clause.

*A. Whether the District Court Abused Its Discretion*
*to Impose Sanctions?*

20

"Rule 37(b), Federal Rules of Civil Procedure, provides that a district court may impose sanctions for failure to comply with discovery orders." Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée, 456 U.S. 694, 695, 102 S. Ct. 2099, 2100 (1982); see Fed. R. Civ. P. 37(b). One of the sanctions a district court may impose under Rule 37 is "an order treating as a contempt of court the failure to obey any orders." Id. The court may also "penalize uncooperative attorneys or parties litigant in discovery proceedings by requiring the payment of 'reasonable expenses, including attorney's fees, caused by the failure. . . .'" Carlucci, 775 F.2d at 1453 (quoting Fed. R. Civ. P. 37(b)).

"Courts . . . have embraced an inherent contempt authority" that encompasses the ability to impose civil and criminal contempt. Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831, 114 S. Ct. 2552, 2559 (1994). "[A] contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.'" Id. at 827-28, 114 S. Ct. at 2557 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441, 31 S. Ct. 492, 498 (1911)). Civil contempt "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." Id. A finding of a failure to comply with discovery orders is a finding of civil contempt. Id. at 833, 114 S. Ct. at 2560.

21

The district court found GM in contempt for failure to produce two categories of discovery. The district court found that GM failed to produce allocation data from all Birmingham dealers from January 2001 forward in violation of its orders on August 27, 2004, and February 3, 2005. The district court also found that GM failed to produce satellite information in violation of the same orders. We first address the allocation data and then address the satellite information.

## 1. Allocation Data

The district court held GM in civil contempt and sanctioned GM for its failure to obey the order of the court to produce "File A," or monthly allocation, data from Chevrolet dealers in the Birmingham area, excluding Serra and Edwards Chevrolet, from January 1, 2001, until June 1, 2001. GM argues that the district court abused its discretion because (1) the data is not important and GM was justified for not retaining the information, (2) the district court made an important factual error, and (3) the issue is really one of spoliation, not violation of a discovery order. We agree that the district court abused its discretion for two reasons.

First, the finding of the district court that the production was deficient by six months is not "fully supported by the record." BankAtlantic, 12 F.3d at 1048

22

(citation omitted). The district court ignored the admission by Serra that limited its misallocation claim to the period beginning April 16, 2001, when the state court litigation between Serra and GM ended. Serra stated that "GM's acts and omissions <u>after the state court litigation</u> are the basis for its misallocation claim" (emphasis added). Although the district court, in its January 28, 2004, order, permitted discovery on the misallocation of vehicles since 2001, Serra specifically limited its misallocation claim in an admission on June 2, 2004, almost three months before the August 27, 2004, hearing. The admission rendered irrelevant any allocation data from January 1, 2001, through April 16, 2001. <u>See</u> Fed. R. Civ. P. 26(b)(1). The production by GM, therefore, was deficient by six weeks of data, not six months.

Second, the district court misquoted the January 28, 2004, order that permitted discovery on certain outlined topics. The sanction order incorrectly stated that the court ordered discovery on "GM's allocation of vehicles since 2001," when, in fact, the January 28, 2004, order permitted discovery on "GM's misallocation of vehicles since 2001." The distinction between "allocation" and "misallocation" is material because the misallocation claim related to an alleged favoritism solely towards Edwards Chevrolet over Serra.

GM objected to the request by Serra for allocation data for other Chevrolet

23

dealers. GM contended that the "misallocation" data in the discovery order required the production of only the allocation data for Serra and Edwards, not for other Chevrolet dealers in Birmingham. The January 28, 2004, discovery order did not foreclose that argument by GM and instructed the parties to seek assistance from the court if disputes arose.

After GM objected, Serra filed a motion to compel discovery, and GM lost the argument. On August 27, 2004, the district court ordered GM to produce the allocation data for all Birmingham dealers from January 2001 forward, but under the retention policy of GM, the data from January 2001 until June 2001 regarding other Chevrolet dealers in Birmingham had been destroyed. When ordered to produce the data on August 27, 2004, GM complied and produced all that it had— allocation data from June 2001 forward. GM could not produce what it did not possess. Although the destruction of the documents by GM may have required the district court to engage in a spoliation analysis under Alabama law, see Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala. 2000), the district court abused its discretion when it held GM in civil contempt and imposed sanctions for the failure by GM to obey the order of the district court to produce documents GM did not possess. See Pesaplastic C.A., 799 F.2d at 1520 ("A party held in contempt

24

may defend his failure to obey a court's order on the grounds that he was unable to comply.").

We also note that the parties now agree that the spoliation issue is moot. After this appeal was filed, on September 2, 2005, GM filed in the district court a notice of production, which informed the district court that the allocation data, dated January 1, 2001, until June 1, 2001, thought to have been destroyed, had actually been retained by a third party. GM produced the data to Serra on September 1, 2005.

## 2. Satellite Information

The district court also held GM in civil contempt for the failure by GM to obey the August 27, 2004, order to produce documents relating to all satellite dealerships. GM contends that the district court abused its discretion because (1) GM performed reasonable searches in response to the order by the district court, (2) the order was not sufficiently clear to support a finding of contempt, and (3) the finding was based in part on clearly erroneous factual findings. After a thorough review of the record, we reject the arguments made by GM and conclude that the district court did not abuse its discretion when it held GM in civil contempt for its failure to produce the satellite information as ordered on August 27, 2004, and February 3, 2005.

On August 27, 2004, the district court clearly ordered GM to produce all documents "[c]reating, evidencing, terminating, implementing, continuing" the satellite program. The court was unambiguous: "If it has to do with the satellite program, and it's a document, then you need to produce it." When GM suggested that the order required GM to "contact[] the hundred and fifty or so zone managers across the country," the district court replied, "I suggest you contact your hundred and fifty zone managers . . . . And then you produce the documents . . . that relate to the satellite." The district court stressed that GM must produce "any GM satellite as to any document that's within the scope of their request." The court gave GM 60 days to produce the documents.

GM failed to produce any documents relating to satellite agreements by the deadline prescribed by the court. Instead, on October 29, 2004, 62 days after the order by the district court to produce the information, GM produced a list of 23 dealerships that had active satellite agreements and their locations. On November 11, 2004, GM supplemented its responses with 12 additional names and locations of dealerships with terminated satellite agreements. Even this late production by GM did not comply with the August 27, 2004, order. GM did not provide any "documents . . . that relate[d] to the satellite" dealerships, as ordered by the district court. Instead, it produced a list of the names and locations of the satellite

26

dealerships.

GM argues that the August order and discovery requests required it to produce only a list of satellite dealerships. GM contends that the district court ordered it to produce documents within the scope of the discovery requests, and the only requests that asked for documents referenced a "satellite program," which GM contends does not exist. GM argues that it produced the list of satellite dealerships, as requested, but did not provide any documents because GM has never had a "satellite program." The problem for GM is that it did not make this argument to the district court during the August 27, 2004, hearing and the district court rejected this argument in the February 3, 2005, hearing.

The district court unambiguously instructed GM to produce all documents in its possession that related to satellite dealerships. Moreover, the record is clear that GM understood, at the August 27, 2004, and the February 3, 2005, hearings, what the district court ordered it to produce. Any argument to the contrary is unsupported by the record.

After GM produced the documents found in the search from the telephone calls, counsel for Serra repeatedly contacted counsel for GM regarding the failure to produce information regarding satellite dealerships that GM representatives testified existed in their depositions. Although Serra outlined alleged deficiencies

in the production, the record does not reflect that GM took any action in response to these alleged deficiencies. When the district court issued an order to show cause why GM should not be sanctioned for the failure to comply with the earlier orders, GM finally undertook a manual search of its 4100 Chevrolet dealer files, which yielded nine undisclosed satellite dealerships and, on May 16, 2005, produced those additional documents. Only after this manual search could GM have known that the list was finally complete— seven and a half months after GM was ordered to produce the documents.

Although GM argues that the district court sanctioned GM because it failed to perform a manual search in the first instance, the factual record belies this assertion. GM contemplated that a manual search would be necessary to identify the requested documents during the August 27, 2004, hearing. If GM was unclear about the scope of the discovery request or the August 27, 2004, order, GM was obliged to request clarification from the court; it was "not free to ignore the Order [of the district court] and to impose [its] own" interpretation of the order. Carlucci, 775 F.2d at 1448 (citations omitted).

Although GM should have understood the scope of the discovery order following the August 27, 2004, hearing, any doubts GM had about the scope of discovery should have disappeared by February 3, 2005, when the district court

28

found the production was deficient and threatened sanctions for "failing to provide documents in its possession and control relating to specific satellite dealerships." The district court gave GM 14 days to cure the deficiencies, but GM did not perform a manual search until more than three months later, on May 12, 2005. It was not an abuse of discretion for the district court to conclude that the failure of GM to produce documents about satellite dealerships was due to contumacy rather than good faith misinterpretation.

## B. Whether the Sanctions Imposed by the District Court Violated Due Process?

Although the district court did not abuse its discretion in determining that GM had violated the orders to produce satellite information, the more serious question about just sanctions remains. Whether a district court has the power to impose sanctions for a violation of a discovery order "depends exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery by listing a variety of remedies which a court may employ." Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 207, 78 S. Ct. 1087, 1093 (1958). "The district court has broad discretion [to impose sanctions], and this is 'especially true when the imposition of monetary sanctions is involved.'" BankAtlantic, 12 F.3d at 1048. "Deeply rooted in the common law tradition is the power of any court to 'manage

29

its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers'" and parties that appear before the court. Malautea v. Suzuki Motor Co., 987 F.3d 1536, 1545 (11th Cir. 1993) (quoting Carlucci, 775 F.2d at 1447). The broad discretion of the district court to manage its affairs is governed, of course, by the most fundamental safeguard of fairness: the Due Process Clause of the Fifth Amendment. See Ins. Co. of Ireland, 456 U.S. at 707, 102 S. Ct. at 2106-07. To comply with the Due Process Clause, a court must impose sanctions that are both "just" and "specifically related to the particular 'claim' which was at issue in the order to provide discovery." Id. at 707, 102 S. Ct. at 2107.

GM appeals two sanctions imposed by the district court: (1) the $700,000 fine, and (2) the striking of the affirmative defenses of res judicata and other doctrines of issue preclusion. Neither sanction satisfies the basic standard of due process. We address each sanction in turn.

### 1. The $700,000 Fine

GM argues that the fine imposed by the district court is unjust and out of proportion with the harm caused to Serra by the production delay. Although the "'imposition of coercive sanctions by way of fines is generally an area in which appellate courts must rely heavily on the informed exercise of the district court's

discretion,'" In re Grand Jury Subpoena Duces Tecum, 955 F.2d 670, 673 (11th Cir. 1992) (citation omitted), that discretion is not unbridled, Dorey v. Dorey, 609 F.2d 1128, 1135 (5th Cir. 1980). "[I]n cases invoking the sanction power of Rule 37[,] the district court must 'clearly state its reasons so that meaningful review may be had on appeal.'" Carlucci, 775 F.2d at 1453 (quoting Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 505 (4th Cir. 1977)).

In Carlucci, we explained that a fine for misconduct must be based on a record of evidence and a rationale. We reviewed sanctions imposed by a district court against an attorney for gross misconduct and recalcitrance. Id. at 1442. The district court found that the attorney had acted in bad faith and fined him $10,000. Id. The court stated four grounds for the sanctions, including the nature of the misconduct, burden on the court, deterrence, and the fee the lawyer had earned through his misconduct. Id. at 1453. On appeal, we explained that "[t]he magnitude of sanctions awarded is bounded under Rule 37 only by that which is 'reasonable' in light of the circumstances," and stressed that we could not uphold a fine "unless there is offered on the record both a justification for the sanction and an accounting by the [district] court." Id. Because "the court below failed to set forth an accounting adequate to justify the figure adopted," we concluded that "we simply are in no position to resolve" whether the sanctions were just. Id. at 1453-

31

54. Accordingly, we reversed and remanded "so that the district court [could] create a record accounting for costs adequate to sustain whatever sanction that court ultimately decides is justified in light of the repeated refusal . . . to abide by that court's discovery directives." Id. at 1454.

Here, the district court provided even less of a record and rationale for its fine of $700,000 than the deficient reasons articulated by the district court in Carlucci. The district court offered no rationale whatsoever for the $50,000 a day sanction. Although the court found that GM was in contempt for 98 days, which, at $50,000 a day, would amount to $4.9 million, the court limited the sanction to $700,000, or 14 days of contempt, and the district court provided no explanation for its decision to limit the fine to 14 days. It is impossible for this Court to provide meaningful review on appeal when the district court fails to give any justification for its decision. See id. at 1453. We cannot evaluate whether the fine was "just" and "specifically related to the particular 'claim' which was at issue in the order to provide discovery." Ins. Co. of Ireland, 465 U.S. at 707, 102 S. Ct. at 2107.

On remand, the district court must provide a rationale for any fine. The costs to the court of the numerous motions, hearings, and orders are an appropriate consideration. See Carlucci, 775 F.2d at 1453. As we explained in Carlucci, the

district court "may also find that the fine is better deemed costs to be paid in full or in part to" Serra or its attorneys for their litigation expenses in compelling the relevant discovery. Id. at 1454. Whatever the court decides, it must create a record of its reasons for the imposition of any fine to afford meaningful review by this Court. See id. at 1453.

## 2. The Affirmative Defenses

The remaining sanction raises the same kind of problem. GM argues that the district court violated due process because "there is absolutely no nexus between the documents that the district court ordered produced in its discovery orders and the court's sanction striking GM's affirmative defenses of res judicata, issue preclusion, judicial estoppel, or law of the case doctrine." We agree.

In Insurance Co. of Ireland, the Supreme Court addressed whether the district court violated due process when the court overruled an objection to personal jurisdiction as a sanction for the failure by the defendants to provide documents regarding personal jurisdiction, as required by a discovery order. Id. at 695, 102 S. Ct. at 2101. The Supreme Court upheld the sanction and explained that because of the failure of the defendants to provide discovery, the plaintiff was unable to determine the extent of contacts between the defendants and the forum state. Id. at 709, 102 S. Ct. at 2107. The Court concluded that the sanction was

"specifically related" to the discovery abuse, because the imposition of the sanction "took as established the facts . . . that [the plaintiff] was seeking to establish through discovery." Id. at 709, 102 S. Ct. at 2107-08.

Here, the district court struck three defenses regarding the preclusive effect of the earlier litigation in the state courts, but those defenses had no apparent relationship with the discovery abuse. The discovery orders compelled the production of documents regarding satellite agreements between GM and Chevrolet dealers nationwide and vehicle allocation data for Chevrolet dealers in the Birmingham area, but those documents were unrelated to the earlier litigation in the state courts. As with the monetary sanctions, the district court failed to state any reasons for striking these defenses. Because the legal defenses were not "specifically related to the particular 'claim' which was at issue in the order to provide discovery," id. at 707, 102 S. Ct. at 2107, the sanctions violated the due process rights of GM.

## IV. CONCLUSION

Because the district court abused its discretion, we reverse the finding of contempt regarding the production of allocation data. We affirm the finding of contempt regarding the failure to produce the satellite information. Because the sanctions imposed by the district court violated the due process rights of GM, we

34

vacate the sanctions and reinstate the affirmative defenses of GM that were struck by the district court. We remand this action to the district court for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.**